**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| E-Z Serve Convenience Stores, Inc., | ) | Case No. 02-83138 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Richard M Hutson, II, Chapter 11 | ) | |
| Trustee for E-Z Serve Convenience | ) | |
| Stores, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 05-09046 |
| | ) | |
| v. | ) | |
| | ) | |
| Patrick Florence, Arcadia Homes of | ) | |
| North Carolina, Inc., and Sara | ) | |
| Dobani, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

THIS MATTER came on before the Court for trial on December 8, 2008 in Durham,

North Carolina after due and proper notice. Vicki L. Parrott appeared on behalf of the Plaintiff,

the Trustee in this case, and Patrick Florence ("Florence") appeared pro se.   After careful

consideration of the evidence, the Court makes the following findings of fact and conclusions of

law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure:

### Procedural History

On October 4, 2002 (the "Petition Date"), E-Z Serve Convenience Stores, Inc. ("E-Z

Con"), E-Z Serve Corporation, SSCH Holding Corp., Swifty Serve Holding Corp., and Swifty

Serve, LLC (collectively, the "Debtor") filed voluntary petitions under Chapter 11 of the

Bankruptcy Code.  At the time of filing, the Debtor operated over 600 convenience stores through direct ownership, indirect ownership, and leases.  On October 18, 2002, Richard M. Hutson, II (the "Plaintiff" or "Trustee") was appointed to serve as the Chapter 11 Trustee for the Debtor.  The cases were consolidated for the purposes of administration until November 9, 2004, when E-Z Serve Corporation, SSCH Holding Corp., Swifty Serve Holding Corp., and Swifty Serve, LLC were converted to Chapter 7.

On September 29, 2005, Plaintiff filed a complaint naming Arcadia Homes of North Carolina, Inc. ("Arcadia"), Sara Dobani, Inc., and Florence as defendants.  Florence is the sole shareholder and president of Arcadia.  The Debtor and Sara Dobani, Inc. resolved all claims pursuant to a compromise and settlement, and the Court granted summary judgment in favor of the Plaintiff on the claims asserted against Arcadia.  The Plaintiff has asserted claims against Florence for breach of fiduciary duty, constructive fraud, fraudulent misrepresentation, negligent misrepresentation, unfair and deceptive trade practices, and punitive damages.

### Findings of Fact

1.      Prior to the Petition Date, the Debtor was in the business of owning and operating convenience stores primarily located throughout the southeastern United States.  The Debtor acquired, sold, and leased convenience stores as part of a comprehensive business plan.

2.      Prior to April 15, 2002, one of the stores the Debtor owned in fee simple was a store located at 2385 Highway 92, Ackworth, Cherokee County, Georgia, known by the Debtor as Store #26 ("Store #26").

3.      In May 2000, the Debtor hired Florence, a licensed real estate broker, to manage the disposition of convenience stores that were not directly operated by the Debtor and that the

Debtor intended to sell.  Initially, Florence was part of the Debtor's real estate department, and Florence's position title was "Real Estate Disposition Manager."  Florence's employment duties included obtaining and evaluating offers to liquidate the Debtor's properties, negotiating sales, and contacting potential buyers.  His goal was to obtain offers to liquidate as many of the Debtor's properties as possible.  Florence also inventoried the Debtor's real estate and valued those real estate holdings, many of which were environmentally contaminated.  When seeking a buyer for a store, it was the general business practice of the Debtor to first contact the existing tenant to see if the tenant was interested in purchasing the property.  Florence was the individual responsible for interfacing directly with purchasers on behalf of the Debtor.

4.      In correspondence dated August 21, 2001 to Clay Hamner ("Hamner"), the CEO of the Debtor at the time, Florence threatened to resign from his employment with the Debtor unless his position was restructured.  Shortly thereafter, Florence began to report directly to Hamner.  Florence was the only employee of the Debtor who negotiated these sales, and it was his responsibility to review all documentation regarding the disposition of any stores. When necessary, he consulted with Dan Waters ("Waters"), the Vice President of the Debtor in charge of environmental compliance, about environmental issues.

5.      During his employment, Florence attended meetings regarding store sales at least once a week at which he would report on the status of stores, pending sales, and negotiations.  Hamner relied upon the information presented by Florence and did not "check behind" or verify Florence's reports to him.  Hamner also relied upon Florence's opinion of a store's value.  Hamner put complete trust and confidence in Florence and relied upon Florence to obtain the best price for a store.  Mark King ("King"), the Debtor's former Chief Financial Officer, was

under the impression that Florence was an officer of the Debtor because Florence was eligible for the senior management program, whose participants were primarily officers, and he had the authority to sign documents on behalf of the Debtor.

6.      One of the stores for which Florence was responsible was Store #26.

7.      On December 20, 2001, Florence, in his capacity as president of Arcadia, caused Arcadia to contract with the Debtor to purchase Store #26 for $125,000.00 contingent upon Arcadia obtaining financing.

8.      Store #26 was operated by Mahmood Dobani ("Dobani"), the Debtor's tenant, under the name Kwik Food and Gas.  Sometime in December of 2001, Dobani contacted Steven Mills ("Mills"), an attorney in Lawrenceville, Georgia.  Mills is involved in the convenience store business both as an attorney and an investor.  Dobani wished to purchase Store #26, and Mills set up a corporation, Sara Dobani, Inc. for that purpose.  The documents for incorporation were executed on December 31, 2001 and January 2, 2002.  Mills testified that in order to have those documents prepared by December 31, 2001, he would have met with Dobani prior to that time and that he would also have obtained a retainer prior to preparing the documents.  He did not know the exact date that he first met with Dobani, but estimated that it would have been in early December 2001.

9.      After forming Sara Dobani, Inc., Mills assisted Dobani with contract negotiations to purchase Store #26.  Mills negotiated directly with Florence.  He was under the impression that he was negotiating with Florence as a representative of the Debtor.  Mills communicated with Florence by phone and all correspondences were sent to the Debtor's address in Durham, North Carolina.

4

10.    On January 31, 2002, Sara Dobani, Inc. entered into a contract with Arcadia, by and through Florence, pursuant to which Sara Dobani, Inc. agreed to purchase Store #26 from Arcadia for $275,000.00.  Except for the purchase price, the material terms of the transaction between Arcadia and Sara Dobani were identical to the terms of the transaction between Arcadia and the Debtor.  As a result of prior dealings, Mills was generally familiar with the business of the Debtor, and he was aware that the Debtor operated through numerous affiliates and subsidiaries.  Mills assumed that Arcadia was somehow affiliated with the Debtor.  At the time, the Debtor was the owner of record of Store #26.

11.    In preparation for the purchase, Mills investigated certain environmental issues related to Store #26.  Specifically, the property was contaminated by petroleum hydrocarbon that had been released from one or more underground storage tanks ("USTs") on the property.  Mills verified that the Debtor was the owner of the USTs and therefore, pursuant to applicable law, was the responsible party liable for the environmental contamination.  Accordingly, Mills requested that the Debtor execute an environmental assurance agreement in favor of Sara Dobani, Inc.  Mills also verified that Store #26 was enrolled in the GUST Trust Fund, which meant that up to $1 million in environmental remediation costs would be covered.

12.    Due to the environmental issues with Store #26, Sara Dobani, Inc. was unable to obtain financing sufficient to complete the purchase.  On March 5, 2002, Mills sent written notice terminating the contract pursuant to a provision in the contract that provided as such.  This notice was addressed to Florence and the Debtor at the Debtor's corporate address.

13.    Dobani, still interested in purchasing Store #26, continued to seek financing.  Around mid-March 2002, Mills decided to become an investor in Sara Dobani, Inc., along with Mansor

Sharifali, with whom Mills owns Ceder Properties, a real estate holding company. Mills

withdrew as counsel for Sara Dobani, Inc. and obtained new counsel. Fortified with additional

funds, Sara Dobani, Inc. renewed the contract to purchase Store #26. It agreed to pay

$75,000.00 in cash and execute a note and deed of trust in favor of Arcadia for the balance.

14.     On April 15, 2002, the Debtor sold all of its interest in Store #26 to Arcadia. Steven

Haft, an officer of the Debtor, executed a deed on behalf of the Debtor in favor of Arcadia.

15.     On April 15, 2002, Florence in his capacity as president of Arcadia executed a

promissory note, in favor of the Debtor, in the amount of $125,000.00, the full amount of the

purchase price ("Arcadia Note"). Pursuant to the terms of the Arcadia Note, Store #26 was to be

pledged as collateral to secure all obligations under the Arcadia Note; however, no mortgage or

deed of trust was ever executed by Arcadia or recorded. Hamner recalled having a conversation

with Florence in which Florence inquired whether it would be possible to sell Store #26 to

family that lived near the store and wished to operate the store. Florence did not disclose that he

wanted to purchase Store #26 himself, nor that he wanted to purchase it for the purpose of

reselling it.

16.     On April 30, 2002, approximately two weeks after Arcadia purchased Store #26 from the

Debtor, Florence, on behalf of Arcadia, executed a deed transferring Store #26 to Sara Dobani,

Inc. in exchange for $75,000.00 in cash, a promissory note in the amount of $200,000.00 (the

"Dobani Note"), and a deed of trust in favor of Arcadia. The closing on the sale of Store #26 to

Sara Dobani, Inc. occurred on May 1, 2002. Mills had no knowledge of the existence of the

Arcadia Note at the time of the closing.

17.     As part of the closing between Arcadia and Sara Dobani, Inc., the Debtor entered into an

6

Environmental Assurance Agreement in favor of Sara Dobani, Inc., which obligated the Debtor, at its sole cost and expense, to continue environmental remediation activities with respect to Store #26. Ownership of the USTs was transferred directly from the Debtor to Sara Dobani, Inc. Sara Dobani, Inc. also executed an assignment of lease which purported to assign the lease agreement between the Debtor and Kwik Food and Gas to Sara Dobani, Inc. While there is a signature on the document on the line above the name "Clay Hamner," Hamner testified that the signature was not his signature. Sara Dobani, Inc. also received a copy of a bill of sale from the Debtor for any personal property owned by the Debtor located in Store #26. The language on this bill of sale for Store #26 is identical to a bill of sale for Store #18, which was sold just a few days prior to Store #26, except for the fact that at the bottom of the first page, the last sentence is cut off mid-sentence. The signature page is so precisely identical to the signature page on Store #18's bill of sale that it appears to be an exact copy.

18.     Pursuant to the Arcadia Note, Arcadia was to begin making monthly payments to the Debtor of principal and interest in the amount of $1,194.57 beginning June 1, 2002. On June 3, 2002, Arcadia paid $223.98 to the Debtor and offset it against the Arcadia Note for unpaid taxes in the amount of $970.59. In July 2002, Arcadia was entitled to an offset for pre-paid rents in the amount of $1,194.57. On August 9, 2002 and again on September 6, 2002, Arcadia paid the amount of $1,194.57 to the Debtor pursuant to the Arcadia Note. Arcadia has not paid any amounts to the Debtor pursuant to the Arcadia Note since September 2002.

19.     Florence's employment with the Debtor ceased on September 9, 2002.

20.     From June 1, 2002 through September 30, 2005, Sara Dobani, Inc. made all payments that came due under the Dobani Note to Arcadia.

7

21.     When the Debtor filed for relief under Chapter 11 of the Bankruptcy Code on October 4, 2002, it had insufficient funds to pay accrued payroll or withholding taxes.  There was gasoline on the premises of many stores, which constituted a potential environmental hazard, as well as perishable goods.  The Debtor had no ability to secure the stores from vandalism or theft.  In view of the lack of operating funds, the Trustee immediately focused on preserving assets, and then began the process of liquidation.  By mid-2003, hundreds of the Debtor's convenient store locations had been sold.

22.     In late 2003, the Trustee began the process of taking inventory of the Debtor's intangible assets, and he became aware of the Arcadia Note as well as the default on payments.  In late 2004 or early 2005, the Trustee wrote a demand letter to Arcadia for payment on the Arcadia Note.  At the time, the Trustee believed that Arcadia owned Store #26, and the Trustee did not discover that Store #26 was owned by Sara Dobani, Inc. until the fall of 2005.  Shortly after learning of the subsequent transfer of Store #26, the Trustee filed the present adversary proceeding.

23.     At trial, Florence's testimony regarding the sequence of events leading up to this adversary proceeding was inconsistent.  At one point, Florence indicated that he first had contact with someone associated with Sara Dobani, Inc. about the purchase of Store #26 in late 2000, prior to the time that Sara Dobani, Inc. was incorporated.  Subsequently, Florence insisted that he began "initial conversations" with Sara Dobani, Inc. in January 2002.  At another point, Florence indicated that he did have conversations with Dobani prior to December 20, 2001, but the interest "ebbed and flowed" because of the environmental contamination.  As to the purchase price, Florence insisted that he believed that Arcadia's purchase price of $125,000.00 for Store #26 was a fair price because of the environmental contamination.  Florence testified that he did not understand that Arcadia

8

would not be liable for the environmental contamination unless it became the owner and/or operator of the USTs, and that he did not know that the property was enrolled in the GUST Trust Fund. Florence also testified that, despite the fact that the Arcadia Note states that it is to be secured by Store #26, he did not understand what "secured" meant under Georgia law. As such, Florence asserted that he did not know there should have been a deed of trust. He explained that he only was familiar with North Carolina real estate law. The Court finds that Florence's testimony was generally not credible.

24.     Sara Dobani Inc. settled with the Trustee and paid the Trustee the sum of $177,625.91. The amount was held in an escrow account by the Trustee pending further orders of this Court as to proper distribution.

25.     On January 23, 2007, the Court entered summary judgment against Arcadia and found that the Debtor is entitled to recover $103,573.96 plus interest from January 12, 2007 at the rate of 3.97%. The Court also ordered that the Trustee was entitled to the funds held in escrow paid by Sara Dobani, Inc. Those funds totaled $180,432.25 as of January 12, 2007.

<u>**Conclusions of Law**</u>

**I.  Breach of Fiduciary Duty**

The Court finds that Florence and the Debtor were engaged in a fiduciary relationship and that Florence breached his fiduciary duty to the Debtor. A breach of fiduciary duty claim requires the existence of a fiduciary relationship and a breach of a fiduciary duty arising from that relationship. *White v. Consolidated Planning, Inc.,* 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004). "A fiduciary relation is said to exist '[w]herever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in

equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence.'" *Id*. at 293, 603 S.E.2d at 155 (citing *Vail v. Vail*, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951)).  Domination and influence upon the other party are essential components of any fiduciary relationship.  *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 705, 708 (2001).  *See also Abbitt v. Gregory*, 201 N.C. 577, 160 S.E. 896, 906 (1931) (stating that "[t]he relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.  It not only includes all legal relations, such as attorney and client, broker and principal, ... principal and agent ... but it extends to any possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.")

As a general rule, in North Carolina, the relationship between an employer and employee is not a fiduciary relationship.  *Dalton v. Camp*, 353 N.C. at 651, 548 S.E.2d at 707.   However, in some limited instances, if there is a showing that the employee was in position of dominance, influence, and control, the court may find that the relationship between an employer and employee is a fiduciary relationship.  *See Helms v. Sellethics Marketing Group, Inc.*, 2006 WL 3490365, *4 (W.D.N.C. Dec. 1, 2006); *Dalton*, 353 N.C. at 651, 548 S.E.2d at 708.  *See also Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 348 (4th Cir.1998) (applying North Carolina law, stating "[w]hen one party figuratively holds all the cards-all the financial power or technical information, for example-the special circumstance of a fiduciary relationship has arisen.").

Primarily, there are two published North Carolina cases that discuss whether the employee-employer relationship is a fiduciary relationship.  In *Dalton v. Camp*, the employee was a

10

production manager, and the court found that "absent a finding that the employer in the instant case was somehow subjugated to improper influences or domination of his employee-an unlikely scenario as a general proposition and one not evidenced by these facts in particular-we cannot conclude that a fiduciary relationship existed between the two." 353 N.C. at 652, 548 S.E.2d at 708. The court stated the employee's duties were "not unlike those of employees in other businesses and can hardly be construed as uniquely positioning him to exercise dominion over" the employer. *Id*. The court described the employee's duties as "those delegated to him by his employer, such as overseeing the business's day-to-day operations by ordering parts and supplies, operating within budgetary constraints, and meeting production deadlines." *Id*. at 652, 548 S.E.2d at 718. In contrast, in the case of *Sara Lee Corp. v. Carter*, the court of appeals affirmed the trial court's finding that the employee was an agent of the employer and thus there was a fiduciary relationship. 129 N.C. App. 464, 470-71, 500 S.E.2d 732, 736-37 (1998), *rev'd* on other grounds. The trial court found that the employee "had discretion to obtain computer parts and services 'from whatever source he thought best,' and [the employee's] supervisors 'trusted [employee] implicitly with the ordering and the purchasing of computer parts and trusted him to obtain those parts at the lowest possible prices." *Id*. at 470, 500 S.E.2d at 736. After review, in *Sara Lee Corp. v. Carter*, the North Carolina Supreme Court not only found a fiduciary relationship, but also found that the employee breached the fiduciary duty. 351 N.C. 27, 30, 519 S.E.2d 308, 310 (1999).

In this case, the Court finds that the relationship between Florence and the Debtor is that of a fiduciary relationship. Florence's relationship with the Debtor is unlike the employee-employer relationship found in *Dalton v. Camp* and more synonymous to the employee-employer relationship found in *Sara Lee Corp. v. Carter*. Like the employee in *Sara Lee Corp.*, Florence acted as an

11

agent of the Debtor.  *See SNML Corp. v. Bank of North Carolina*, 41 N.C. App. 28, 36, 254 S.E.2d 274, 279 (1979) (stating that an "agent is one who, by the authority of another, undertakes to transact some business or manage some affairs on account of it.  He is a substitute, or deputy, appointed by his principal primarily to bring about business relations between the latter third persons.").  Florence's primary employment duty was obtaining and evaluating offers to liquidate the Debtor's properties.  Florence was the only employee who negotiated the sales, as such, Florence was responsible for interacting directly with purchasers on behalf of the Debtor.  The directors of the Debtor relied exclusively on Florence's information about the offers on the properties, as Florence was the only employee negotiating the sales and reviewing all documentation regarding the sales.  Furthermore, Florence had authority to sign documents on behalf of the Debtor.  Florence was in a position of influence and control over the Debtor's liquidation of its properties.  A fiduciary duty may also be imposed because Florence's role was that of a *de facto* officer.  *See Kinesis Advertising, Inc., v. Hill*, 187 N.C. App. 1, 15-16, 652 S.E. 2d 287, 295 (2007) (stating that "in North Carolina, an individual may owe a fiduciary duty to the corporation if he is considered to be *de facto* officer or director, with authority for tasks such as signing tax returns, offering major input as to the company's formation and operation, or managing the company.")

The Court further finds that Florence breached his fiduciary duty to the Debtor.  As an agent, "the principal has placed trust or confidence in the agent, and the agent employee is bound to the exercise of the utmost good faith, loyalty and honesty toward his principal or employer."  *SNML Corp.*, 41 N.C. App. at 37, 254 S.E.2d at 280.  As a *de facto* officer, Florence owes a fiduciary duty to the corporation.  *Kinesis Advertising, Inc.*, 187 N.C. at 15-16, 652 S.E.2d at 295.  Florence,

negotiated the sale of Store #26 between Arcadia and Sara Dobani, Inc., for $275,000.00 while he

had a contract pending between Arcadia and the Debtor for the sale of Store #26 for $125,000.00.

Florence did not disclose that he was purchasing Store #26 for himself, through Arcadia, nor did

Florence disclose that he was prepared to resale Store #26 for a substantially higher price. As such,

Florence breached his fiduciary duty to the Debtor. *See Sara Lee Corp.*, 351 N.C. at 30, 519 S.E.2d

at 310 (showing a breach when the employee used his position to make profits on transactions

without disclosing his financial interest).

## II.  Constructive Fraud

The Court finds that Florence engaged in constructive fraud against the Debtor.

Constructive fraud differs from actual fraud because "it is based on a confidential relationship

rather than a specific misrepresentation." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666,

488 S.E.2d 215, 224 (1997). To establish a claim of constructive fraud, a plaintiff must show: (1) a

relationship of trust and confidence (a fiduciary relationship), (2) that the defendant took advantage

of that position of trust for his or her own benefit, and (3) that plaintiff was, as a result, injured.

*White*, 166 N.C. App. at 294, 603 S.E.2d at 156. "The primary difference between pleading a claim

for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that

the defendant benefit himself." *Id. E.g., Barger*, 346 N.C. at 667, 488 S.E. 2d at 224 (stating that

"requirement of a benefit to defendants follows logically from the requirement that a defendant

must harm the plaintiff by taking advantage of their relationship of trust and confidence.").

In this case, Florence's conduct satisfies all three prongs of the constructive fraud test. The

Court finds that Florence and the Debtor had a fiduciary relationship. Florence, holding himself out

as a representative of the Debtor, was able to negotiate a sale for Arcadia, his company, to sell Store

#26 at a substantially higher price than he negotiated for the Debtor to sell Store #26 to Arcadia. As a result of Florence's conduct, the Debtor did not realize the full value of Store #26 and Florence profited from the sale.

## III. Fraudulent Misrepresentation

As a preliminary matter, the Court shall address the applicability of the statute of limitations to the Trustee's fraudulent misrepresentation claim.  Florence alleges that the Plaintiff's action for fraudulent misrepresentation is barred by N.C. Gen. Stat. § 1-52(9), which provides that a claim for relief on the ground of fraud or mistake must be filed within three years of the aggrieved party's "discovery ... of the facts constituting the fraud or mistake."  N.C. Gen. Stat. § 1-52(9)(2001).  The term "discovery" means when the fraud was either actually discovered or should have been discovered in the exercise of reasonable diligence.  *See Grubb Properties, Inc. v. Simms Investment Co.*, 101 N.C. App. 498, 501, 400 S.E.2d 85, 88 (1991).  When the statute is pled as an affirmative defense, the burden rests on the party asserting a cause of action to remove the bar.  *State Farm Fire and Casualty Co. v. Darsie*, 161 N.C. App. 542, 547, 589 S.E.2d 391, 396 (2003).   Where a relationship of trust and confidence exists between parties, a more relaxed standard of reasonable diligence applies.  *Forbis v. Neal*, 261 N.C. 519, 525, 649 S.E.2d 382, 386 (1964) (applying a "principle of leniency" to determine when the statute of limitations began to run because of the confidential relationship between the parties).

Here, Florence contends that the Debtor should have discovered the fraud when Hamner executed the bill of sale or environmental assurance agreement in favor of Sara Dobani, Inc.  First, there is evidence that Florence prepared some of the documentation for the sale of Store #26 using photocopies of signatures, therefore what Hamner actually "executed" for Store #26 is

14

questionable.  Second, a relationship of trust and confidence existed between the Debtor and Florence and Florence's duties included the responsibility of reviewing all documentation regarding the disposition of any stores.  The Court finds that the Debtor had no reason to suspect fraud or investigate until default occurred on the Arcadia Note at the end of September 2002, which is within the three year statute of limitations time period.

To show fraudulent misrepresentation, the plaintiff must show: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party.  *Hospira Inc. v. Alphagary Corp.*, 671 S.E.2d 7, 11 (2009); *Harrold v. Dowd*, 149 N.C. App. 777, 783, 561 S.E.2d 914, 918 (2002).  In this case, Florence represented to the Debtor that Acadia's offer of $125,000.00 was the best offer available for Store #26.  Florence did not disclose that Sara Dobani Inc., was willing to pay $275,000.00 for Store #26.  Florence did not tell the Debtor about the higher offering price, a material fact, because he wished to flip Store #26 from Arcadia, his company, to Sara Dobani, Inc., for a profit of approximately $150,000.00.  Due to Florence's position, he was aware of both offers for Store #26, however, he did not inform the Debtor.  As a result of Florence's representations, the Debtor allowed Acadia to purchase Store #26 for $125,000.00.  So, the Debtor did not receive the full market value of Store #26, which was $275,000.00, the price Sara Dobani, Inc. was offering at the same time that Debtor and Acadia entered into a sales agreement.  As such, the Court finds that Florence engaged in fraudulent misrepresentation.

## IV.  Negligent Misrepresentation

To prevail on a claim for negligent misrepresentation, the plaintiff must show that he: "(1)

15

justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one

who owed the relying party a duty of care." *Hospira*, 671 S.E.2d at 12; *Raritan River Steel Co. v.*

*Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 613 (1988). In general terms,

North Carolina courts have adopted the language found in the Restatement of the Law:

> (1) One who, in the course of his business, profession or employment, or in any other
> transaction in which he has a pecuniary interest, supplies false information for the guidance
> of others in their business transactions, is subject to liability for pecuniary loss caused to
> them by their justifiable reliance upon the information, if he fails to exercise reasonable care
> or competence in obtaining or communications in the information
> (2) Except as stated in subsection (3), the liability in subsection (1) is limited to loss
> suffered
>> (a) by the person or one of a limited group of persons for whose benefit and
>> guidance he intends to supply the information or knows that the recipient intends to
>> supply it; and
>> (b) through reliance upon it in a transaction that he intends the information to
>> influence or knows that the recipient so intends or in a substantially similar
>> transaction
> (3) the liability of one who is under a public duty to give the information extends to loss
> suffered by any of the class of persons for whose benefit the duty is created, in any of the
> transactions in which it is intended to protect them.

Restatement (Second) of Torts § 522 (1977). *See Raritan River*, 322 N.C. at 209, 367 S.E.2d at

614; *Alva v. Cloninger*, 51 N.C. App. 602, 611, 277 S.E.2d 535, 541 (1981). The party must show

that he relied on the information supplied. *Hospira*, 671 S.E. 2d at 12 (stating a party cannot show

justifiable reliance when the plaintiff does not directly rely on information prepared by the

defendant).

In this case, the Debtor, through Hamner, relied on Florence's representations about the best

sales price as it pertained to Store #26's value. By relying on Florence's information, the Debtor

lost profits on the sale of Store #26. Florence owed the Debtor a duty of care to give the Debtor full

disclosure about possible sales and price negotiations, and Florence did not use reasonable care

when relaying incorrect information to the Debtor. As such, Florence made negligent

misrepresentations that injured the Debtor.

## V. Unfair and Deceptive Trade Practices Act

The Court finds that Florence violated the Unfair and Deceptive Trade Practices Act ("UDTPA"). The purpose of the UDTPA is to "provide a civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public within this State[,] and [it] applies to dealings between buyers and sellers at all levels of commerce." *Bhatti v. Buckland*, 328 N.C. 240, 245, 400 S.E.2d 440, 444-45 (1991). The UDTPA defines "commerce" to include all business activities, however denominated, but not professional services rendered by a member of a learned profession. N.C. Gen. Stat. § 75-1.1(b). "'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493. To prevail on a claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), the plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff. N.C. Gen. Stat. § 75-1.1 (2005). The plaintiff need not "show fraud, bad faith, deliberate or knowing acts of deception, or actual deception," but only "show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Gress v. Rowboat Co.*, 661 S.E.2d 278, 281 (2008) (quoting *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 452-53, 279 S.E.2d 1, 7 (1981). Conduct constituting a breach of fiduciary duty and constructive fraud is sufficient to support an unfair and deceptive trade practices claim so long as the other elements of the claim are also present. *Spence v. Spaulding & Perkins Ltd.*, 82 N.C. App. 665, 668, 347 S.E.2d 864, 866 (1986).

17

To "affect commerce," a defendant's allegedly deceptive acts must have a tangible effect on the marketplace. *See Esposito v. Talbert & Bright, Inc*., 181 N.C. App. 742, 746, 641 S.E.2d 695, 698 (2007). (upholding a denial of summary judgment when no effect on commerce was alleged beyond an employee's relationship with his employer). *See also Durling v. King*, 146 N.C. App. 483, 488, 554 S.E.2d 1, 4 (2001); *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 62, 554 S.E.2d 840, 848 (2001). "Although commerce is defined broadly under G.S. § 75-1.1(b) .... 'the fundamental purpose of G.S. § 75-1.1(b) is to protect the consuming public.'" *Durling,* 146 N.C. App. at 488, 554 S.E.2d at 4 (quoting *Prince v. Wright,* 141 N.C. App. 262, 268-269, 541 S.E.2d 191, 197 (Ct. App. 2000)). Whether the acts in question constitute an unfair and deceptive practice in or affecting commerce is a matter of law. *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 664, 370 S.E.2d 375, 389 (1988); *Durling*, 146 N.C. App. at 488-89, 554 S.E.2d at 4; *Poor v. Hill*, 138 N.C. App. 19, 28, 530 S.E.2d 838, 844 (2000). *See also Walker v. Fleetwood Homes of N. C., Inc*, 362 N.C. 63, 70-71, 653 S.E.2d 393, 399-400 (2007); *Gray v. N. C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000) (showing that the determination of whether an act or practice is an unfair or deceptive practice that violates § 75-1.1 is a question of law). Furthermore, the behavior must affect commerce in a commercial setting, *see Powell*, 88 N.C. App. 61, 62-68, 362 S.E.2d 796, 796-800 (1987) (showing the defendant, a realty and insurance company, misrepresenting information regarding factors that may adversely affect the value of property to sale the property to buyers), not in a private relationship type setting such as corporate governance issues, *Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 357-58, 578 S.E.2d 692, 694 (2003), securities transactions, *Linder v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 167 (4th Cir. 1985) (distinguishing securities transactions by stating that the other situations

18

where the UDTPA is applicable showed defendants' anti-competitive conduct injuring the

consuming public, whereas in this case, the minority shareholders were allegedly deprived of a fair

market value for their stock due to a merger), or disputes arising from employment, *Durling*, 146

N.C. App. at 488, 554 S.E.2d at 4.  It is clear that the "alleged violators must be engaged in a

business, a commercial or industrial establishment or enterprise." *Bhatti*, 328 N.C. at 244, 400

S.E.2d at 443.

Generally, employee-employer relationships are not within the intended scope of the

UDTPA.  *Buie v. Daniel Intern. Corp.*, 56 N.C. App. 445, 448, 289 S.E.2d 118, 119 (1982).

However, the mere existence of a employee-employer relationship does not exclude a party from

pursuing an UDTPA claim.  *Dalton*, 548 S.E.2d at 710, 353 N.C. at 656 (stating that "employers

have successfully sought damages under the [a]ct when an employee's conduct: (1) involved

egregious activities outside the scope of his assigned employment duties, and (2) otherwise

qualified as unfair or deceptive practices that were in or affecting commerce.").  For example, in

*Sara Lee Corp.*, the employer brought an UDTPA claim against the employee.  351 N.C. at 30, 519

S.E.2d at 310.  The employee "engaged in self-dealing business activities wherein he sold computer

parts and services to his employer from companies owned by him." *Id*. at 32-33, 519 S.E.2d at 311.

The employer in *Sara Lee Corp.* engaged in transactions with the employee that the employer

believed were "legitimate transactions secured at competitive prices in the marketplace." *Id*. at 33,

519 S.E. at 312.  The court characterized the employee's actions as engaging in buyer-seller

transactions with the employer, which fell within the scope of the UDTPA; as such, the employee

in *Sara Lee Corp.* "engaged in self-dealing conduct and 'business activities' ... [and] mere

employee status at the time he committed these acts does not safeguard him" from the UDTPA.

351 N.C. at 34, 519 S.E. 2d at 312.  *Contra In re Brokers, Inc.*, 396 B.R. 146, 162-63 (Bankr.

M.D.N.C. 2008) (finding that the employee's acts were not "in or affecting commerce" as the acts

related to the internal corporate affairs and the employer did not present evidence of it or others

being "mislead, over-charged, or otherwise treated unfairly in the buyer-seller relationship.");

*Dalton*, 353 N.C. at 657-58, 348 S.E.2d at 711 (finding that the employee had duties that were

limited in scope to those commonly associated with any employee and that the employee did not

"serve his employer in the capacity of either buyer or seller ... [or] in any alternative capacity

suggesting that his employment was such that it otherwise qualified as 'in or affecting commerce'"

as in *Sara Lee*).

     The Court has found that Florence breached his fiduciary duty, which supports the finding

that Florence engaged in an unfair and deceptive practice.  Also due to Florence's actions, the

Debtor was injured by not selling Store #26 at its full market value at the time.  The only question is

whether Florence's actions were "in or affecting commerce."   This case is similar to *Sara Lee* in

that Florence was engaged in buyer-seller transaction.  Florence was the sole employee responsible

for negotiating the sales of the Debtor's properties.  The Debtor relied completely upon Florence's

opinion and Florence had the power to execute documents on the Debtor's behalf.   Florence's

actions had a tangible effect on the marketplace, as Florence used his influence to cause the Debtor

to agree to purchase Store #26 from Florence's company, Arcadia, at a price lower than market

value, which is evidenced by the fact that Florence negotiated to sale Store #26 to Sara Dobani, Inc.

for a substantially higher price at the same time.  Florence acted as a seller and Debtor acted as a

buyer in this fraudulent and unethical transaction, due to Florence's fiduciary duties to the Debtor.

As such, the transaction was "in or affecting commerce" and the Plaintiff has shown that Florence

violated the UDTPA.

## VI.  Punitive Damages

The Plaintiff seeks punitive damages against Florence.  Under North Carolina law, punitive damages may be awarded to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts.  N.C. Gen. Stat. § 1D-1; *Harrell v. Bowen*, 362 N.C. 142, 144-45, 655 S.E.2d 350, 352 (2008).  The North Carolina General Statutes sets forth the standards for awarding punitive damages as follows:

> (a) Punitive damages may be awarded only if the claimant proves the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>> (1) Fraud.
>> (2) Malice.
>> (3) Willful or wanton conduct.
> (b) The claimant must prove the existence of an aggravating factor by clear and convincing evidence.
> (c) Punitive damages shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another.  Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to the punitive damages.
> (d) Punitive damages shall not be awarded against a person solely for breach of contract.

N.C. Gen. Stat. § 1D-15.  If the plaintiff meets the requirements of §1D-15, the jury or trier of fact, may determine, in its discretion, whether to award punitive damages.  *See* N.C. Gen. Stat. § 1D-35.  *See also Horner v. Byrnett*, 132 N.C. App. 323, 329, 511 S.E.2d 342, 346 (1999).  An award of punitive damages shall not exceed three times the amount of compensatory damages or $250,000.00, whichever is greater.  N.C. Gen. Stat. § 1D-25(b).  When determining the amount of punitive damages, the trier of fact shall consider the purpose of punitive damages stated in N.C.

Gen. §1D-1 and may consider the following evidence:

> a. the reprehensibility of the defendant's motives and conduct
> b. the likelihood, at the relevant time, of serious harm
> c. the degree of the defendant's awareness of the probable consequences of its conduct
> d. the duration of the defendant's conduct
> e. the actual damages suffered by the claimant
> f. any concealment by the defendant of the facts or consequences of its conduct
> g. the existence and frequency of any similar past conduct by the defendant
> h. whether the defendant profited from the conduct
> i. the defendant's ability to pay punitive damages, as evidence by its revenues or net worth

N.C. Gen. Stat. § 1D-35.

The Plaintiff has shown that Florence has committed fraud, an aggravating factor, by clear and convincing evidence. The award of punitive damages is in the court's discretions. As such, after careful consideration of the facts and circumstances of this case, the Court has determined that it will not award punitive damages to the Plaintiff against Florence.[1] The Court will enter a judgment consistent with the findings of this memorandum opinion as set forth herein.

---

[1] Damages under the UDTPA are trebled automatically. *See* N.C. Gen. Stat. §§ 75-1.1, 75-16; *Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 79 N.C. App. 51, 62, 338 S.E.2d 918, 924-25 (1986). As such, the Court is aware that if punitive damages were awarded, the Debtor would have to elect between the award of punitive damages or trebled damages pursuant to the UDTPA, as the Debtor may not have both. *See Ellis v. Northern Star Co.*, 326 N.C. 219, 227, 388 S.E.2d 127, 132 (1990); *Compton v. Kirby*, 157 N.C. App. 1, 21, 577 S.E.2d 905, 917-18 (2003).

## SERVICE LIST

Patrick E. Florence
7209 Caviness Jordan Road
Cedar Grove, NC 27231

Vicki L. Parrott
P. O. Box 2208
Chapel Hill, NC 27515-2208

Richard M. Hutson
P. O Box 2252-A
Durham, NC 27702

Michael D. West
P. O. Box 1828
Greensboro, NC 27420-1828